# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CAMPAIGN LEGAL CENTER,

*Plaintiff*,

*v.*

HERITAGE ACTION FOR AMERICA,

*Defendant*.

Civil Action No. 1:22-cv-01248-CJN

## **DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

GLOSSARY ................................................................................................... viii

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 3

    A.    The FEC's Enforcement Of Administrative Complaints Under FECA ..................... 3

        1.    The FEC's Bipartisan Structure ........................................................... 3

        2.    The FEC's "Reason To Believe" Vote On The Merits Of A Complaint ........... 4

        3.    Disclosure Of FEC Non-Enforcement Decisions ...................................... 6

        4.    Complainant's Recourse And Judicial Review ......................................... 6

        5.    The Commission's Concealment Of Certain FEC Dismissal Actions ............... 7

    B.    Non-Committee Independent Expenditure Reporting Obligations ............................ 9

        1.    Section 30104(c) And The FEC's Implementing Regulation ........................ 9

        2.    The Vacatur Of The FEC's Implementing Regulation ............................... 10

        3.    The FEC's Post-*Crossroads-I* Reporting Guidance ................................ 11

    C.    Heritage Action ............................................................................... 13

    D.    Procedural History ........................................................................... 15

        1.    CLC's Administrative Complaint Against Heritage Action ......................... 15

        2.    CLC's Lawsuit Against The FEC ......................................................... 17

        3.    CLC's Citizen Suit Against Heritage Action ........................................... 19

LEGAL STANDARDS ....................................................................................... 19

ARGUMENT .................................................................................................. 20

I.    THE COURT LACKS SUBJECT MATTER JURISDICTION .......................................... 21

    A.    CLC Cannot Establish The Preconditions Necessary To File This Citizen Suit ....... 21

        1.    The FEC Did Not Fail To Act On CLC's Administrative Complaint ............. 21

        2.    The FEC's Supposed Failure To Act Was Not Contrary To Law ................... 22

        3.    The FEC Did Not Fail To Conform To Judge Kelly's Order To Act ............... 25

        4.    The FEC's Dismissal Of The Administrative Complaint For Reasons Of Prosecutorial Discretion Was Not Contrary To Law ................................. 25

    B.    The Court Lacks Subject Matter Jurisdiction With Respect To Claims For Which Plaintiff Failed To Exhaust Its Administrative Remedies ............................ 30

i

## TABLE OF CONTENTS
(continued)

**Page**

II.   CLC FAILS TO STATE A CLAIM .................................................................... 31

    A.   Enforcing § 30104(c) Against Heritage Action Would Violate Due Process ........... 31

        1.   Due Process Requires Fair Notice Of § 30104(c)'s Requirements.................. 31

        2.   Heritage Action Did Not Receive Fair Notice That § 30104(c) Required Donor Disclosure After *Crossroads I* ................................................ 32

        3.   The Commission Failed To Interpret § 30104(c) With The Force Of Law...... 33

        4.   The Commission Announced That It Would Not Enforce § 30104(c) With Respect To Heritage Action's October 15, 2018 Quarterly Report ........ 35

        5.   The Commission Dismissed The Complaint To Avoid A Due-Process Violation ........................................................................................ 36

    B.   The Complaint Fails To State A Claim That Heritage Action Violated § 30104(c) ...................................................................................................... 38

        1.   FECA Requires CLC To Allege That Heritage Action Failed To Disclose Donors Who Earmarked Their Contributions For Political Purposes ............. 38

        2.   The Complaint Does Not Plausibly Allege That Any Donations To Heritage Action Were "Earmarked For Political Purposes"............................ 40

        3.   The Allegations In The Complaint Undermine Any Inference That Donors Earmarked Their Contributions To Heritage Action For Political Purposes ........................................................................................ 43

        4.   Allowing CLC's Claims to Proceed Would Raise First Amendment Concerns........................................................................................ 44

CONCLUSION.................................................................................................................... 45

ii

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Ams. for Prosperity Found. v. Bonta,*
    141 S. Ct. 2373 (2021)..................................................................................................45

*Arbaugh v. Y & H Corp.,*
    546 U.S. 500 (2006)....................................................................................................28

*Arizona v. California,*
    530 U.S. 392 (2000)....................................................................................................28

*Arizona v. City & Cnty. of San Francisco,*
    142 S. Ct. 1926 (2022)................................................................................................35

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..............................................................................................20, 41

*Ass'n of Irritated Residents v. EPA,*
    494 F.3d 1027 (D.C. Cir. 2007)..................................................................................25

*Bd. of Trade of City of Chi. & Subsidiaries v. Comm'r,*
    106 T.C. 369 (1996)...................................................................................................39

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)....................................................................................................43

*Buckley v. Valeo,*
    424 U.S. 1 (1976)................................................................................................ *passim*

*Cavalier v. Cath. Univ. of Am.,*
    306 F. Supp. 3d 9 (D.D.C. 2018)...............................................................................20

*Citizens United v. FEC,*
    558 U.S. 310 (2010)....................................................................................................14

*CLC & Democracy 21 v. FEC,*
    952 F.3d 352 (D.C. Cir. 2020).....................................................................................5

*CLC v. FEC,*
    312 F. Supp. 3d 153 (D.D.C. 2018)......................................................................5, 32

*CLC v. Iowa Values,*
    No. 1:21-cv-389 (RCL), 2021 WL 5416635 (D.D.C. Nov. 19, 2021) ...............28, 31

*Common Cause v. FEC,*
    489 F. Supp. 738 (D.D.C. 1980).........................................................................22, 23

*Common Cause v. FEC,*
    842 F.2d 436 (D.C. Cir. 1988)............................................................................5, 21, 22

*CREW v. Am. Action Network,*
    410 F. Supp. 3d 1 (D.D.C. 2019)...............................................................................30

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*CREW v. Am. Action Network,*
No. 1:18-cv-945 (CRC), 2022 WL 612655 (D.D.C. Mar. 2, 2022) .......................................29

*CREW v. FEC,*
164 F. Supp. 3d 113 (D.D.C. 2015) ........................................................................................8

*CREW v. FEC,*
243 F. Supp. 3d 91 (D.D.C. 2017) ..........................................................................................8

*CREW v. FEC,*
316 F. Supp. 3d 349 (D.D.C. 2018) .................................................................................*passim*

*CREW v. FEC,*
892 F.3d 434 (D.C. Cir. 2018) ........................................................................7, 25, 26, 27

*CREW v. FEC,*
904 F.3d 1014 (D.C. Cir. 2018) (per curiam) ...............................................................10, 39

*CREW v. FEC,*
971 F.3d 340 (D.C. Cir. 2020) ........................................................................................10, 11

*CREW v. FEC,*
993 F.3d 880 (D.C. Cir. 2021) ...................................................................................5, 7, 26

*Crossroads Grassroots Pol'y Strategies v. FEC,*
788 F.3d 312 (D.C. Cir. 2015) ...................................................................................5, 22, 28

*D.C. Pro. Taxicab Drivers Ass'n v. District of Columbia,*
880 F. Supp. 2d 67 (D.D.C. 2012) ........................................................................................20

*DCCC v. FEC,*
831 F.2d 1131 (D.C. Cir. 1987) .............................................................................................7

*Delta Air Lines, Inc. v. Export–Import Bank of U.S.,*
85 F. Supp. 3d 250 (D.D.C. 2015) .......................................................................................19

*DSCC v. FEC,*
No. 1:95-cv-0349 (JHG), 1996 WL 34301203 (D.D.C. Apr. 17, 1996)...........................22, 23

*Emily's List v. FEC,*
581 F.3d 1 (D.C. Cir. 2009) .................................................................................................43

*End Citizens United PAC v. FEC,*
No. 21-1665 (TJK), 2022 WL 1136062 (D.D.C. Apr. 18, 2022) .........................................28

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) ...............................................................................................................31

*FEC v. Beaumont,*
539 U.S. 146 (2003) ...............................................................................................................13

iv

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*FEC v. Democratic Senatorial Campaign Comm.*,
454 U.S. 27 (1981) ................................................................................................. 3, 4

*FEC v. Mass. Citizens for Life, Inc.*,
479 U.S. 238 (1986) ................................................................................................. 38

*FEC v. Rose*,
806 F.2d 1081 (D.C. Cir. 1986) ............................................................................... 23

*FEC v. Survival Educ. Fund, Inc.*,
65 F.3d 285 (2d Cir. 1995) ....................................................................................... 10

*Fleming v. USDA*,
987 F.3d 1093 (D.C. Cir. 2021) ............................................................................... 31

*Hallstrom v. Tillamook Cnty.*,
493 U.S. 20 (1989) ................................................................................................... 29

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......................................................................................... *passim*

*In re Am. Rivers & Idaho Rivers United*,
372 F.3d 413 (D.C. Cir. 2004) ................................................................................. 23

*In re Nat'l Cong. Club*,
Nos. 84-5701, 84-5719, 1984 WL 148396 (D.C. Cir. Oct. 24, 1984) ..................... 23

*Jordan v. FEC*,
68 F.3d 518 (D.C. Cir. 1995) ................................................................................... 30

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ........................................................................................... 19, 28

*Mansfield, Coldwater & Lake Mich. Ry. v. Swan*,
111 U.S. 379 (1884) ................................................................................................. 19

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ................................................................................... 35

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) ................................................................................................... 34

*Perot v. FEC*,
97 F.3d 553 (D.C. Cir. 1996) ................................................................................... 21

*Pub. Citizen, Inc. v. FERC*,
839 F.3d 1165 (D.C. Cir. 2016) ............................................................................... 21

*Satellite Broad. Co. v. FCC*,
824 F.2d 1 (D.C. Cir. 1987) ..................................................................................... 32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*SNR Wireless LicenseCo, LLC v. FCC,*
   868 F.3d 1021 (D.C. Cir. 2017) ................................................................ 32

*Spinelli v. Goss,*
   446 F.3d 159 (D.C. Cir. 2006) .................................................................. 30

*Stewart v. NEA,*
   471 F.3d 169 (D.C. Cir. 2006) .................................................................. 20

*Telecomms. Rsch. & Action Ctr. v. FCC,*
   750 F.2d 70 (D.C. Cir. 1984) .................................................................... 22

*Wis. Fam. Action v. FEC,*
   No. 21-C-1373, 2022 WL 844436 (E.D. Wis. Mar. 22, 2022) ......................... 39, 42

*XP Vehicles, Inc. v. Dep't of Energy,*
   118 F. Supp. 3d 38 (D.D.C. 2015) ............................................................. 20

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. amend. V ................................................................................... 31

5 U.S.C. § 553 .................................................................................... 11, 34

5 U.S.C. § 706 ........................................................................................... 22

26 U.S.C. § 501 ......................................................................................... 13

52 U.S.C. § 30101 ....................................................................................... 9

52 U.S.C. § 30104 ............................................................................... *passim*

52 U.S.C. § 30106 ..................................................................................... 4, 5

52 U.S.C. § 30107 ......................................................................................... 5

52 U.S.C. § 30109 ............................................................................... *passim*

Pub. L. No. 92-225, 86 Stat. 3 (1972) ............................................................... 3

**OTHER AUTHORITIES**

11 C.F.R. § 100.16 ....................................................................................... 9

11 C.F.R. § 109.10 .............................................................................. *passim*

11 C.F.R. § 110.6 ................................................................................... 39, 40

11 C.F.R. § 111.9 .................................................................................... 6, 7

11 C.F.R. § 111.20 ................................................................................... 6, 7

FEC, *Amendments to Federal Election Campaign Act of 1971; Regulations
   Transmitted to Congress*, 45 Fed. Reg. 15,080 (Mar. 7, 1980) ......................... 34

FEC, *Reporting Independent Expenditures*, 87 Fed. Reg. 35,863 (June 14, 2022) ............ 13, 34

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Fed. R. Civ. P. 12 ...................................................................................................2, 19, 20, 29

Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy:*
*More Deadlock Than Ever*, N.Y. Times (June 8, 2021) .........................................................8

Heritage Action for America, *About* ...................................................................................13

Heritage Action for America, IRS Form 990 (2018) ...................................................................14

IRS, *Social Welfare Organizations* ...............................................................................13

Kristina Peterson, *Heritage Action Advocacy Group Shifts to Bolstering GOP*
*Candidates*, Wall Street J. (July 17, 2018) ......................................................................15, 44

*Policy Statement of Chairman Dickerson and Comm'rs Cooksey and Trainor*
*Concerning the Application of 52 U.S.C. § 30104(c)* (June 8, 2022) .............................. *passim*

Press Release, Heritage Action, *Heritage Action to spend $2.5 million and back*
*12 candidates this November* (Aug. 8, 2018) ............................................................14, 41, 44

Brad Smith, *What Does It Mean When the Federal Election Commission*
*"Deadlocks,"* Institute for Free Speech (Apr. 14, 2009)..........................................................5

## GLOSSARY

To distinguish the cases brought by CREW, this brief follows the D.C. Circuit's convention of referring to each case by the name of the association against which CREW brought an administrative complaint:

***Crossroads I***    *CREW v. FEC*, 316 F. Supp. 3d 349 (D.D.C. 2018) (Howell, C.J.), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020)

***Crossroads II***    *CREW v. FEC*, 904 F.3d 1014 (D.C. Cir. 2018) (per curiam)

***Crossroads III***   *CREW v. FEC*, 971 F.3d 340 (D.C. Cir. 2020) (Srinivasan, C.J.)

***Commission on Hope***  *CREW v. FEC*, 892 F.3d 434 (D.C. Cir. 2018) (Randolph, J.)

***New Models***    *CREW v. FEC*, 993 F.3d 880 (D.C. Cir. 2021) (Rao, J.)

# INTRODUCTION

This citizen suit under the Federal Election Campaign Act (FECA or the Act) rests on a false premise.  On October 16, 2018, Campaign Legal Center (CLC) filed an administrative complaint asking the Federal Election Commission (FEC or Commission) to take enforcement action against Heritage Action for America (Heritage Action), a nonprofit issue-advocacy organization that promotes the advancement of conservative principles.  CLC alleged that Heritage Action had violated 52 U.S.C. § 30104(c) by not disclosing its donors on a quarterly FEC report filed on October 12, 2018, in connection with independent expenditures made in mid-September 2018.

On April 6, 2021, however, three of the FEC's six Commissioners voted against opening an enforcement investigation into these allegations and voted to dismiss the administrative complaint as a matter of prosecutorial discretion under *Heckler v. Chaney*, 470 U.S. 821 (1985).  That failed enforcement vote should have been the end of the road for CLC's administrative complaint against Heritage Action, because FECA requires that at least four Commissioners vote to take enforcement action, and because the D.C. Circuit has held that these nonenforcement decisions are not reviewable (and thus cannot trigger FECA's citizen-suit provision).

CLC nevertheless maneuvered to file this citizen suit under 52 U.S.C. § 30109(a)(8)(C) because the Commission concealed its action on CLC's administrative complaint for over a year and refused to defend itself in *CLC v. FEC*, 1:21-cv-00406 (TJK) (D.D.C.).  Without knowing that the Commission had already acted on CLC's administrative complaint, Judge Kelly entered default judgment against the FEC, concluded that the Commission's alleged failure to act was contrary to law, and authorized CLC to file this citizen suit on the false premise that the FEC had never acted on the administrative complaint against Heritage Action.

It is now clear, however, that this Court lacks subject matter jurisdiction to consider CLC's citizen suit.  CLC cannot establish the jurisdictional preconditions for this citizen suit under § 30109(a)(8)(C) because the FEC did not fail to act on CLC's administrative complaint; the agency's alleged failure to act was not contrary to law; the FEC never failed to conform to Judge Kelly's order to act; and the FEC's dismissal of the complaint in an exercise of prosecutorial discretion under *Chaney* was not contrary to law.  Under controlling D.C. Circuit precedent, the FEC's exercise of prosecutorial discretion bars CLC from invoking FECA's citizen-suit provision. Judge Kelly's authorization for CLC to file this citizen suit is neither binding nor persuasive here— as that court recognized when the Commission belatedly disclosed its action after entry of final judgment.  This Court should therefore dismiss the Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

Alternatively, the Court should dismiss the Complaint because CLC fails to state a claim under Rule 12(b)(6).  Enforcing § 30104(c) against Heritage Action would violate due process because Heritage Action never had fair notice of the law that would apply to its October 2018 reporting of donors in connection with September 2018 independent expenditures.  At the time Heritage Action made and reported its independent expenditures in 2018, two months after Chief Judge Howell in *Crossroads I* vacated the FEC's longstanding interpretation of the donor-disclosure obligation under § 30104(c), the law and regulatory guidance on § 30104(c) was (and remains) uncertain at best, and certainly did not provide fair notice as to what Heritage Action had to disclose on its FEC reports.  For this reason, the full FEC stated in reporting guidance issued following the regulation's vacatur that, as a matter of fairness, it would exercise its prosecutorial discretion and not enforce the new reporting obligations for quarterly disclosure reports filed in October 2018—the very report at issue in this case.  In fact, half of the current Commissioners on

the FEC have twice expressed due-process concerns with enforcing § 30104(c) on this record. Allowing CLC's suit to proceed would put this Court in the position of second-guessing the FEC's nonenforcement decision based on due-process concerns—precisely what *Chaney* forbids.

On the merits, the Complaint does not state a claim that Heritage Action violated § 30104(c) by failing to disclose its donors when it reported making independent expenditures in 2018. Under § 30104(c), Heritage Action was only required to disclose donors who had made political "contributions" to Heritage Action, a term that, under the limiting construction set forth by the Supreme Court in *Buckley v. Valeo* means donations "earmarked for political purposes." 424 U.S. 1, 23 n.24, 109, 110 (1976). Yet the Complaint is devoid of any factual allegations that any such earmarking by donors occurred. Allowing this case to proceed without any allegation of donors earmarking funds for political purposes would conflict with *Buckley* and raise serious First Amendment concerns by chilling nonprofit organizations from engaging in political speech.

## BACKGROUND

### A.  The FEC's Enforcement Of Administrative Complaints Under FECA

This case involves judicial review of the FEC's purported failure to act on an administrative complaint to enforce FECA.

#### 1.  The FEC's Bipartisan Structure

Congress enacted FECA as a comprehensive scheme to regulate the financing of federal election campaigns, political parties, and political committees. Pub. L. No. 92-225, 86 Stat. 3 (1972). Congress subsequently amended the Act to create the FEC and "vested the Commission with 'primary and substantial responsibility for administering and enforcing the Act,' providing the agency with 'extensive rulemaking and adjudicative powers.'" *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (*DSCC*) (citation omitted). Among its delegated

3

authorities, the FEC "has the 'sole discretionary power' to determine in the first instance whether or not a civil violation of the Act has occurred."  *Id.*; *see* 52 U.S.C. § 30106(b)(1) ("The Commission shall have exclusive jurisdiction with respect to the civil enforcement of such provisions.").

Because the FEC wields such immense power over political speakers, Congress carefully structured the six-member Commission to prevent its members from engaging in partisan brinksmanship.  *DSCC*, 454 U.S. at 37.  "[T]he Commission is inherently bipartisan in that no more than three of its six voting members may be of the same political party."  *Id.*; *see* 52 U.S.C. § 30106(a)(2).  The Commission's Chair and Vice Chair, moreover, serve terms of only one calendar year, and may not be from the same political party.  52 U.S.C. § 30106(a)(5).  And "[a]ll decisions" of the Commission concerning "the exercise of its duties and powers" must be made "by a majority vote" of the Commissioners.  *Id.* § 30106(c).

## 2.   The FEC's "Reason To Believe" Vote On The Merits Of A Complaint

As part of FECA's enforcement scheme, Congress chose to permit "any person" believing a violation has occurred or is about to occur to file an administrative complaint with the FEC.  *Id.* § 30109(a)(1).  Given the inherent potential for abuse under such a system, Congress directed that, as a precondition to opening an enforcement investigation into allegations made in an FEC complaint, the Commission must hold an initial vote to determine whether or not, based on the administrative complaint and any response to the complaint, at least four members of the bipartisan FEC have "reason to believe" the respondent "has committed, or is about to commit, a violation of th[e] Act."  *Id.* § 30109(a)(2).  This vote is the only action Congress authorized the Commission to take in the initial phase of a complaint-generated matter.  Absent "an affirmative vote of 4" Commissioners finding "reason to believe," the FEC cannot proceed with an enforcement

4

investigation, *id.*; *see id.* §§ 30106(c), 30107(a)(9), and it "dismisses the administrative complaint." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 315 (D.C. Cir. 2015).

Unsurprisingly, in exercising this congressionally mandated gatekeeping function, the bipartisan FEC occasionally splits on its "reason to believe" vote—typically by a 3-3 breakdown—thus failing to garner the four votes necessary to proceed. *See CLC v. FEC*, 312 F. Supp. 3d 153, 164 n.6 (D.D.C. 2018) (*Democracy 21*) ("The fact that these deadlocks occur is evidence of the Congressional scheme working"), *aff'd sub nom.*, *CLC & Democracy 21 v. FEC*, 952 F.3d 352 (D.C. Cir. 2020). In such event, the FEC has decided the case. As former FEC Chairman Brad Smith put it: "If the FEC votes 3-3 not to find a violation, that means the FEC has determined that the conduct does not violate the law." Brad Smith, *What Does It Mean When the Federal Election Commission "Deadlocks,"* Institute for Free Speech (Apr. 14, 2009), https://bit.ly/3RhwhkR. "It HAS applied the law to the facts, and it HAS reached a result," dismissing the matter. *Id.* Thus, both this court and the D.C. Circuit have deemed this common scenario to result in so-called "deadlock dismissals." *E.g.*, *Common Cause v. FEC*, 842 F.2d 436, 448-49 (D.C. Cir. 1988).[1]

On May 13, 2022, the FEC's Chairman Allen Dickerson and Commissioners Sean Cooksey and Trey Trainor issued a statement explaining that the FEC has "concluded" its "work" if it has voted on the merits of the complaint and failed to garner the four votes FECA requires to proceed with enforcement. Exhibit A at 2-3, attached. As they explained, "the Commission *has already passed judgment* on the entirety of the merits in these matters." *Id.* at 4-5. This situation, the Commissioners noted, is very different from "a matter that the Commission is considering piecemeal over the course of several [meetings] but where it has yet to vote on all the enforcement

---

[1] *See also, e.g.*, *CREW v. FEC*, 993 F.3d 880, 882-83 (D.C. Cir. 2021) (*New Models*); *CREW v. FEC*, 316 F. Supp. 3d 349, 416-17 (D.D.C. 2018) (*Crossroads I*) ("The FEC, when considering whether to commence enforcement proceedings based on an administrative complaint, must dismiss the administrative complaint when the members deadlock three-to-three.").

questions presented." *Id.* at 5.  Because "votes have been taken as to all parties and statements of reasons have been included in the file by the commissioners declining to move forward," they explained, "there is no basis for claiming that the Commission is continuing to deliberate." *Id.* at 2-3.  By deadlocking, the Commission has "finished" its work and, "in fact, acted." *Id.* at 2, 5.

### 3.   Disclosure Of FEC Non-Enforcement Decisions

If the FEC fails to garner four votes to find "reason to believe," it must disclose that fact to the complainant, respondent, and general public.  FECA commands that "[i]f the Commission makes a determination that a person has not violated [the] Act … the Commission shall make public such determination." 52 U.S.C. § 30109(a)(4)(B)(ii).  And the FEC's regulations provide that "[i]f the Commission finds no reason to believe, or otherwise terminates its proceedings, the General Counsel shall so advise both complainant and respondent by letter," 11 C.F.R. § 111.9(b), and "make public such action and the basis therefor" within 30 days of that letter, *id.* § 111.20(a).

### 4.   Complainant's Recourse And Judicial Review

If the FEC dismisses an administrative complaint because it lacks reason to believe a violation has occurred or otherwise fails "to act on such complaint during the 120-day period beginning on the date the complaint is filed"—by holding the "reason to believe" vote—the administrative complainant may sue the FEC in this District challenging the dismissal or failure to act. 52 U.S.C. § 30109(a)(2), (a)(8)(A).  In any such case, a court may declare that the FEC acted "contrary to law" and direct the Commission "to conform with such declaration within 30 days." *Id.* § 30109(a)(8)(C).  If, and only if, the Commission fails to conform with a court's order within 30 days, the complainant may bring a citizen suit in its own name against the administrative respondent to remedy the violation alleged in the administrative complaint. *Id.*

6

In cases where the "the Commission lacks four votes to proceed" with enforcement, "the [C]ommissioners who voted against enforcement must state their reasons why," and "[t]he reasons offered by these so-called controlling Commissioners are then treated as if they were expressing the Commission's rationale for dismissal." *New Models*, 993 F.3d at 883 n.3 (cleaned up). If the complainant challenges the dismissal as "contrary to law" under § 30109(a)(8)(C), this statement of reasons allows the reviewing court to determine "whether reason or caprice" drove the agency's decision. *DCCC v. FEC*, 831 F.2d 1131, 1135 (D.C. Cir. 1987) (R.B. Ginsburg, J.). If the FEC's dismissal was "based even in part on prosecutorial discretion," however, that decision is "not reviewable" under FECA's "contrary to law" standard pursuant to the Supreme Court's decision in *Chaney*. *New Models*, 993 F.3d at 882. Such a dismissal bars the complainant from invoking FECA's citizen-suit provision in § 30109(a)(8)(C) because the complainant cannot establish the statute's preconditions. *Id.*; *CREW v. FEC*, 892 F.3d 434, 440 (D.C. Cir. 2018) (*Commission on Hope*).

### 5.   The Commission's Concealment Of Certain FEC Dismissal Actions

In every terminated enforcement matter, the FEC holds a vote to "[c]lose the file" on the administrative matter. *See, e.g.*, Matter Under Review (MUR) 7137, Certification (July 22, 2021) (voting to "[c]lose the file" in a matter resulting in a signed conciliation agreement, which must be publicly released under 52 U.S.C. § 30109(a)(4)(B)). Unlike the "reason to believe" vote, this vote to close the file is *not* congressionally mandated under FECA. Rather, it is an administrative creation of the Commission that merely serves as the FEC's authorization to the Office of General Counsel to fulfill the non-discretionary notification requirements under FECA and FEC regulations. *See* 52 U.S.C. § 30109(a)(4)(B)(ii); 11 C.F.R. §§ 111.9(b), 111.20(a).

For decades, the FEC has closed the file in matters that resulted in so-called deadlock dismissals—where no further enforcement action would be had—and, indeed, all terminated matters.  As a result, the parties to those administrative matters have been notified of the FEC's vote not to investigate the complaint, and the voting records and any statement of reasons have been released publicly.  This allows the complainant to look to challenge the FEC's dismissal under Section 30109(a)(8).[2]

However, recently the FEC—at the behest of Commissioners Steven Walther, Shana Broussard, and Ellen Weintraub—has refused to close the file in terminated matters.  As the *New York Times* reported in June 2021, based in part on interviews with Commissioner Weintraub, these three Commissioners "are declining to formally close some cases after the Republicans vote against enforcement" in order to "leave[] investigations officially sealed in secrecy and legal limbo"—primarily in protest to the D.C. Circuit's interpretation of *Heckler*.  Shane Goldmacher, *Democrats' Improbable New F.E.C. Strategy: More Deadlock Than Ever*, N.Y. Times (June 8, 2021), https://nyti.ms/3ynO2qb.  The same three Commissioners are then "blocking the F.E.C. from defending itself in court when advocates sue the commission for failing to do its job."  *Id.* By making federal courts "believe" that "deadlocked cases are unresolved," these three Commissioners are trying to "open the door for outside advocacy groups to directly sue … in federal court."  *Id.*

---

[2] *See, e.g.*, MUR 5024, Certification (Nov. 4, 2003) (voting 6-0 to close the file and send the appropriate notices after splitting 3-3 on whether there was reason to believe a violation had occurred); FEC's Partial Mot. to Dismiss at 12, *CREW v. FEC*, 243 F. Supp. 3d 91 (D.D.C. 2017) (No. 16-cv-259), Dkt. No. 12 (explaining that "[a]s a result of" a "three-to-three" "split vote, the Commission closed the file"); FEC's Motion to Dismiss at 11, *CREW v. FEC*, 164 F. Supp. 3d 113 (D.D.C. 2015) (No. 14-cv-1419), Dkt. No. 5 ("If at least four of the FEC's six Commissioners vote to find such reason to believe, the Commission may investigate the alleged violation; otherwise, the Commission dismisses the administrative complaint.").

### B.  Non-Committee Independent Expenditure Reporting Obligations

Among FECA's provisions that the FEC enforces administratively are those requiring the reporting of independent expenditures to the FEC.  An independent expenditure is a communication made without coordination with a candidate, campaign, or political party that "expressly advocat[es] the election or defeat of a clearly identified candidate" for federal office. 52 U.S.C. § 30101(17)(A); 11 C.F.R. § 100.16.

### 1.  Section 30104(c) And The FEC's Implementing Regulation

Section 30104(c)(1) imposes event-driven reporting requirements on organizations like Heritage Action that are not FEC-registered political committees but make independent expenditures in excess of $250 during any calendar year (non-committees).  *See* 52 U.S.C. § 30104(c)(1).  Among other things, this FECA provision, enacted as part of Congress's 1979 amendments to the Act, requires non-committees to disclose the same information concerning their receipts as is required of political committees under § 30104(b)(3)(A)—including the identification of any person who made a "contribution" in excess of $200 during the calendar year. *Id.* § 30104(b)(3)(A).  The report must also identify "each person who made a contribution in excess of $200 … for the purpose of furthering an independent expenditure."  *Id.* § 30104(c)(2)(C).

FECA defines the term "contribution," as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." *Id.* § 30101(8)(A)(i).  The Supreme Court in *Buckley*, in rejecting a vagueness challenge to disclosure provisions under FECA, construed the term "to include not only contributions made directly or indirectly to a candidate, political party, or campaign committee" but also "dollars given to another person or organization that are *earmarked for political purposes*."  424 U.S. at 23 n.24, 78 (emphasis added).  Under this limiting construction, *Buckley*

9

concluded that "'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign." *Id.* at 78. *Buckley*, however, did not further explain what it means for funds to be "earmarked for political purposes." *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285, 294 (2d Cir. 1995).

For nearly 40 years, the scope of the donor-disclosure obligation under § 30104(c) was settled and narrow. The FEC regulation implementing § 30104(c), promulgated four years after *Buckley*, required non-committees that made independent expenditures to disclose only those donors "who made a contribution in excess of $200 … for the purpose of furthering *the* reported independent expenditure." 11 C.F.R. § 109.10(e)(1)(vi) (2018) (emphasis added). That regulation provided fair notice to non-committees about what they must report to the FEC to comply with § 30104(c).

## 2. The Vacatur Of The FEC's Implementing Regulation

All that changed in August 2018, when Chief Judge Howell vacated 11 C.F.R. § 109.10(e)(1)(vi) on the premise that it unduly narrowed § 30104(c)'s donor-disclosure requirements. *Crossroads I*, 316 F. Supp. 3d 349 (D.D.C. 2018), *aff'd*, 971 F.3d 340 (D.C. Cir. 2020). The court interpreted the statute instead to require non-committees to disclose any donors who had made "contributions" to the non-committee for the purpose of influencing federal elections. *Id.* at 377. Relying on *Buckley*, Chief Judge Howell read § 30104(c) to require disclosure of those donors who had intentionally donated funds "'earmarked for political purposes.'" *Id.* at 389; *see CREW v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018) (per curiam) (*Crossroads II*) (ruling that under this interpretation, the "disclosure covers only those [donors] who donate money *for the intended purpose of influencing an election*").

10

The district court stayed the vacatur for 45 days "to provide time for the FEC to issue interim regulations" consistent with the court's opinion. *Crossroads I*, 316 F. Supp. 3d at 415. On September 15, 2018, the Supreme Court stayed the district court's order, but lifted it on September 18, 2018, making the vacatur of 11 C.F.R. § 109.10(e)(1)(vi) effective. The FEC did not appeal the decision, but the respondent in the underlying FEC enforcement matter did. In August 2020, the D.C. Circuit affirmed the district court's decision. *See Crossroads III*, 971 F.3d 340, 343 (D.C. Cir. 2020).

### 3.    The FEC's Post-*Crossroads-I* Reporting Guidance

The FEC never amended 11 C.F.R. § 109.10(e)(1)(vi) through the notice-and-comment procedures of the Administrative Procedure Act (APA). 5 U.S.C. § 553. Nor did it ever issue interim regulations, as Chief Judge Howell had expected. Non-committees were thus left without any enforceable interpretation of § 30104(c) to replace the FEC's longstanding regulation in the aftermath of *Crossroads I*. Instead, on October 4, 2018, the Commission posted a press release providing "guidance to the public on how to proceed consistent with the district court's decision." Exhibit B, attached, *available at* https://bit.ly/3AC0fdx. The FEC's guidance, however, emphasized that, "[i]n the interests of fairness, since no one was on notice until the [*Crossroads I*] district court's decision was handed down on Aug[ust] 3, the Commission will exercise its prosecutorial discretion for the quarterly reports due Oct[ober] 15, 2018." *Id.*

For subsequent quarterly reports, the FEC stated that any non-committee reporting independent expenditures must disclose "the information required by 52 U.S.C. § 30104 (c)(1) and (c)(2)(C)," including (i) the names of any donors who made donations between August 4, 2018, and September 30, 2018, in aggregate amounts over $200 that had been "earmarked for political purposes"; and (ii) "the identification of each of these persons whose contribution(s) in excess of

$200 to the reporting person was made for the purpose of furthering any independent expenditure." *Id.* at 2.  For any donations received prior to "Aug[ust] 3, 2018 (the date of the district court's opinion)," the narrower donor-disclosure obligation under 11 C.F.R. § 109.10(e)(1)(vi) would apply. *Id.*

On June 8, 2022, three Commissioners issued a Policy Statement regarding § 30104(c)'s application to non-committee organizations in light of the fact that, in the four years since *Crossroads I,* "the Commission has not proffered clear guidance on how those organizations should report contributions 'earmarked for political purposes,' in accordance with [*Crossroads I*'s] holding."  *Policy Statement of Chairman Dickerson and Comm'rs Cooksey and Trainor Concerning the Application of 52 U.S.C. § 30104(c)* (June 8, 2022) (June 8 Policy Statement), Exhibit C at 2, attached.  The Commissioners noted that the FEC's 2018 interim guidance, "rather than offering meaningful insight to the regulated community about the precise scope of donor disclosure after [*Crossroads I*] or the meaning of 'earmarked for political purposes,' … largely repeated the district court's vague and imprecise characterization of the Act's reporting mandates, without further exposition."  *Id.* at 4.  They cautioned that "the resulting uncertainty has created a chilling effect on individuals' and organizations' First Amendment rights," and that "[t]he absence of regulatory guidance also raises significant due process issues."  *Id.* at 2.

These three Commissioners thus stated that, going forward, they would, applying the reasoning of *Survival Education Fund,* deem "a donation made to a non-committee organization … 'earmarked for political purposes' within the meaning of § 30104(c)(1) only if it is designated or solicited for, or restricted to, activities or communications that expressly advocate the election or defeat of a clearly identified candidate for federal office."  *Id.* at 7.  "On the other hand, a donor who makes an unrestricted donation to a non-committee organization or designates a donation for

non-electoral purposes like issue advocacy, or who responds to a general solicitation to support the organization's mission, does not make a contribution 'earmarked for political purposes.'" *Id.* The Commissioners added that, in the enforcement context, they would apply their interpretation to any administrative complaints relating to activities occurring after their statement. *Id.* at 8.

"[F]or complaints based on conduct preceding or contemporaneous with th[e] statement," these Commissioners noted that they "generally intend to exercise the Commission's prosecutorial discretion to dismiss complaints alleging failure to disclose contributions under § 30104(c)(1) and seeking general donor disclosure from non-committee organizations that engage in express advocacy activities." *Id.* at 7. As they observed, "[i]t violates principles of fundamental fairness to hold respondents liable for violating legal rules that have not been previously announced, and any attempts by the Commission to enforce vague and confusing guidance risks waste, inefficiency, and significant litigation." *Id.* at 8.

The FEC did not take any steps to amend the vacated regulation until June 8, 2022. *See* FEC, *Reporting Independent Expenditures*, 87 Fed. Reg. 35,863 (June 14, 2022) (interim final rule).

### C. Heritage Action

Heritage Action is a tax-exempt social-welfare organization under 26 U.S.C. § 501(c)(4) that engages in grassroots and lobbying advocacy in support of conservative policies holding true to the ideals of the Founding Fathers. *See* Heritage Action for America, *About*, https://bit.ly/ 3PeLl13 (last visited July 8, 2022). As a 501(c)(4) nonprofit organization, Heritage Action "'may carry on lawful political activities and remain exempt under section 501(c)(4) as long as it is primarily engaged in activities that promote social welfare.'" *FEC v. Beaumont*, 539 U.S. 146, 150 n.1 (2003); *see* IRS, *Social Welfare Organizations*, https://bit.ly/3NU0xiW (last updated Mar. 28, 2022). Such activities may include the use of general treasury funds to make independent

13

expenditures expressly advocating the election or defeat of candidates for federal office—a right protected by the First Amendment. *See Citizens United v. FEC*, 558 U.S. 310, 365 (2010).

In 2018, Heritage Action exercised its First Amendment right to make independent expenditures in connection with certain House midterm races. Compl. ¶ 28, Dkt. No. 1.[3] On August 8, 2018, Heritage Action issued a press release formally announcing that it would be "spending $2.5 million in 12 congressional districts this election cycle" to fund "a combined digital, print, and TV advertising campaign." Press Release, Heritage Action, *Heritage Action to spend $2.5 million and back 12 candidates this November* (Aug. 8, 2018) (2018 Press Release), https://bit.ly/3AOoIwz (Exhibit D, attached); *see* Compl. ¶ 30 n.10. The press release included a statement from Heritage Action's then-Executive Director asserting that Heritage Action had committed to "investing resources in 12 key congressional races across the country" during "[t]h[e] fall." 2018 Press Release. The release also identified the twelve House races Heritage Action would target. *Id.*

That same day, the news service *McClatchy* issued an article discussing Heritage Action's plans to spend $2.5 million on the twelve races identified in the press release. Dkt. No. 1-1. *McClatchy* reported that "[t]o aid their chosen candidates, the organization is planning a three-pronged campaign in the 12 selected districts, set to launch the second week of September." *Id.* As *McClatchy* observed, $2.5 million "is less than what other entities … spend on a single special election, much less the whole fall campaign." *Id.* And, indeed, it signified a minor investment for an organization with over $11.3 million in revenue in 2018, including nearly $10.8 million from donations and grants. *See* Heritage Action for America, IRS Form 990 (2018), https://bit.ly/3OQFzCW. *McClatchy* further noted that these plans were not news: the *Wall Street Journal* had

---

[3] Unless otherwise noted, "Dkt. No." refers to filings entered in this case.

reported on Heritage Action's decision to spend $2.5 million of "its money" a month earlier, on

July 17, 2018.  Dkt. No. 1-1 (citing Kristina Peterson, *Heritage Action Advocacy Group Shifts to*

*Bolstering GOP Candidates*, Wall Street J. (July 17, 2018), https://on.wsj.com/3ORBoH2).

Although Heritage Action is not a political committee, if it makes independent

expenditures in excess of $250 with respect to any federal election in a calendar year, it must report

those expenditures to the FEC.  52 U.S.C. § 30104(c); 11 C.F.R. § 109.10.  On October 12, 2018,

Heritage Action filed an October Quarterly Report with the FEC (covering the reporting period

from July 1 through September 30), disclosing $374,177 in independent expenditures disseminated

on September 17 and 19, 2018, in the form of mailers and digital advertising related to certain of

its targeted congressional races.  Compl. ¶ 35.  This report disclosed that Heritage Action had made

those independent expenditures "from [its] general treasury funds."  *Id.* ¶¶ 36-39.  Heritage Action

did not disclose any donor information on the report.  *Id.* ¶ 41.  Heritage Action made additional

independent expenditures "from [its] general treasury funds" in October 2018, which it reported

to the FEC on its Year-End Report filed on January 24, 2019 (covering the period from October 1

through December 31).  *Id.* ¶ 43.  Heritage Action also did not disclose any donor information on

this report.  *Id.*

### D.  Procedural History

CLC has initiated a number of actions to enforce § 30104(c) against Heritage Action.

#### 1.  CLC's Administrative Complaint Against Heritage Action

CLC filed its administrative complaint against Heritage Action on October 16, 2018, two

months after Chief Judge Howell decided *Crossroads I*, a month after the vacatur of the FEC's

regulation took effect, 12 days after the FEC issued its post-*Crossroads-I* guidance, and four days

after Heritage Action had filed its October Quarterly Report.  The administrative complaint alleged

that, "by failing to report the identity of any contributors on its October quarterly independent expenditure report, Heritage Action failed to comply with FECA's reporting obligations at 52 U.S.C. § 30104." Dkt. No. 1-2 ¶ 23. The FEC acknowledged receipt of the administrative complaint and designated the enforcement matter as MUR 7516. Dkt. No. 1-3.

On April 6, 2021, the Commission took "action[]" on CLC's administrative complaint. Exhibit E at 4, attached (FEC Vote Certification). On that day, the Commission voted on whether there was reason to believe that Heritage Action had "violated 52 U.S.C. § 30104(c)(1) by failing to disclose donors who contributed for political purposes" and "52 U.S.C. § 30104(c)(2)(C) by failing to further identify the donors who donated for the purpose of funding an independent expenditure." *Id.* The three Commissioners who voted against enforcement—Commissioners Cooksey, Dickerson, and Trainer—supported dismissal as a matter of agency enforcement discretion "under *Heckler v. Chaney.*" *Id.*

These Commissioners wrote a "'controlling'" Statement of Reasons explaining their votes. Exhibit F, attached (Statement of Reasons). In the Statement of Reasons, they explained that "[n]o evidence … was presented to the Commission" "contradicting Heritage's statements" that it had not used reportable contributions in making its 2018 independent expenditures. *Id.* at 5. They also noted that the FEC's Office of General Counsel had "recommended dismissal as a matter of prosecutorial discretion of the [complaint's] allegations as to the reporting of the independent expenditures made on September 17 and 19, 2018, 'consistent with the [*Crossroads I*] Guidance." *Id.* at 5 n.8 (emphasis added). Lastly, they confirmed that they "voted to dismiss, as an exercise of prosecutorial discretion, the allegation in this matter that Heritage Action … improperly reported certain independent expenditures by not including donor information." *Id.* at 3 & n.1. Among other prudential considerations, the Commissioners highlighted the lack of "clarity" in the

FEC's reporting guidance—which they emphasized could not "substitute for proper rulemaking that might address the underlying legal complexities raised by the underlying judicial opinions"— and raised several unanswered questions arising from Judge Howell's *Crossroads I* decision, including, "crucially, in the absence of new regulatory language, how is the Commission to interpret a judicial opinion that clearly invalidated a portion of our regulations, but of necessity opined upon facts clearly distinguishable from those in this matter?" *Id.* at 6.  The Commissioners summarized their "reasons[] [for] vot[ing] to dismiss th[e] matter as an exercise of prosecutorial discretion" as follows:  "At the heart of this matter is First Amendment protected activity that took place at a time when the meaning of the provision of the law at issue was in flux, in a matter which came before the Commission as part of a tremendous enforcement backlog." *Id.* at 5.

The same three Commissioners likewise voted on April 6, 2021, to close the administrative file so that CLC and Heritage Action could be notified of the FEC's action.  FEC Vote Certification at 5; *see* Statement of Reasons at 5 n.9.  Commissioners Broussard, Walther, and Weintraub, however, refused to do so, thereby concealing the FEC's action from the parties and the courts. *Id.* at 5.  The FEC again took a vote to close the administrative file on January 11, 2022, but the same three Commissioners blocked it.  *Id.* at 6.  Additional efforts to bring the question of closing the file to a vote were subsequently blocked.  Statement of Reasons at 5 n.9.  Instead, the FEC waited to formally close the administrative file until June 7, 2022, after Judge Kelly had authorized CLC to file this lawsuit and denied Heritage Action's motion to intervene.  Exhibit G, attached.

### 2.   CLC's Lawsuit Against The FEC

Over two years after filing the administrative complaint, CLC sued the FEC, alleging that it had failed to act on CLC's administrative complaint and that this inaction was contrary to law under § 30109(a)(8)(A).  Compl., *CLC v. FEC* (Feb. 16, 2021), Dkt. No. 1.  When the FEC failed

to enter an appearance or otherwise defend itself—because Commissioners Broussard, Walther, and Weintraub refused to authorize a defense, FEC Vote Certification at 6—the clerk of court entered default against the FEC on May 10, 2021.  *CLC v. FEC* (May 10, 2021), Dkt. No. 9.

On March 25, 2022, the court issued an order finding that "the FEC has taken no action on" CLC's administrative complaint and that this "failure to act … is contrary to law."  Dkt. No. 1-4 at 2-3 (March 25 Order).  It therefore directed the FEC to "conform to" the order "within 30 days" under § 30109(a)(8)(C) "by acting on" CLC's "administrative complaint."  *Id.* at 3.

On May 3, 2022, the court ruled that the FEC had "failed to conform" to the March 25 Order by not "acting on Campaign Legal Center's administrative complaint" within 30 days and that CLC may therefore "bring 'a civil action'" against Heritage Action.  Dkt. No. 1-5.

In response to the FEC's belated disclosure through the Freedom of Information Act that it had in fact acted on the administrative complaint, Heritage Action moved to intervene before Judge Kelly to seek reconsideration of the court's May 3, 2022 final judgment or appeal it.  *CLC v. FEC* (May 10, 2022), Dkt. No. 24.  On June 6, 2022, Judge Kelly "[r]egrettably" denied the motion to intervene as "not timely."  Dkt. No. 17-4 at 3.  In doing so, however, the court observed that "Heritage Action can advance the same" arguments in CLC's citizen suit before this Court, which "will have to consider them, because whether the Commission's failure to act was contrary to law and whether it conformed with this Court's order to act implicate" this Court's ability to entertain this citizen suit.  *Id.* at 7.  Judge Kelly also emphasized that the denial of the intervention motion does not "condone the Commission's unseemly failure to appear and defend itself in this Court, or what Heritage Action casts as a scheme to hide its activity and leave regulated parties in legal limbo."  *Id.* at 8.  Heritage Action has appealed Judge Kelly's final judgment and denial of its

18

intervention motion, and has moved to hold the appeals in abeyance pending resolution of this motion to dismiss. *See* Nos. 22-5140, 22-5167 (D.C. Cir.).

### 3.   CLC's Citizen Suit Against Heritage Action

Two days after Judge Kelly entered final judgment, CLC filed this suit alleging that Heritage Action violated the reporting requirements under § 30104(c) as interpreted by Chief Judge Howell in *Crossroads I*. *See* Compl. ¶ 59.  In support, CLC points to the August 8, 2018 Heritage Action press release and related *McClatchy* article describing Heritage Action's plan to spend $2.5 million on independent expenditures in specific 2018 midterm races. *Id.* ¶¶ 30-34.

The Complaint asserts that Heritage Action had a duty to disclose its donors in connection with its reporting of the independent expenditures disseminated in September 2018. *See id.* ¶ 41. CLC further alleges that Heritage Action was obligated to disclose its donors in connection with its reporting of independent expenditures made during October 2018. *Id.* ¶ 43.  This latter allegation was not raised in CLC's administrative complaint, which was filed over two months before the report referenced in the Complaint. *See* Dkt. No. 1-2.  Nor does CLC allege anywhere in the Complaint that donors earmarked their donations to Heritage Action for political purposes.

### LEGAL STANDARDS

Rule 12(b)(1) requires dismissal if the court lacks subject matter jurisdiction, which is "the first and fundamental question" that a court must decide in every case. *Mansfield, Coldwater & Lake Mich. Ry. v. Swan*, 111 U.S. 379, 382 (1884).  The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When analyzing a Rule 12(b)(1) motion, a court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged. *See Delta Air Lines, Inc. v. Export–Import Bank of U.S.*, 85 F. Supp. 3d 250, 259

(D.D.C. 2015).  A court need not accept, however, inferences unsupported by factual allegations. *See XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 56 (D.D.C. 2015).

To state a claim under Rule 12(b)(6), a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This standard requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Where a complaint pleads facts that are "'merely consistent with'" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*.  "[T]he facts alleged in the complaint 'must be enough to raise a right to relief above the speculative level.'"  *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 25 (D.D.C. 2018).

This Court may "consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice," *Stewart v. NEA*, 471 F.3d 169, 173 (D.C. Cir. 2006)—including certain "governmental agency actions," *D.C. Pro. Taxicab Drivers Ass'n v. District of Columbia*, 880 F. Supp. 2d 67, 72 (D.D.C. 2012).

## ARGUMENT

The Court should dismiss this citizen suit premised on the fiction that the FEC failed to act on CLC's administrative complaint for three reasons.  *First*, the Court lacks jurisdiction under § 30109(a)(8)(C) because CLC cannot establish FECA's preconditions to filing a citizen suit now that the FEC has disclosed that it dismissed CLC's administrative complaint in the exercise of its prosecutorial discretion under *Chaney*.  *Second*, enforcing § 30104(c) against Heritage Action would violate due process because Heritage Action never had fair notice that it must disclose its donors after Chief Judge Howell vacated the FEC's longstanding interpretation of the statute and

20

the FEC failed to replace it.  *Third*, CLC fails to plausibly allege that Heritage Action violated § 30104(c) because the Complaint lacks any allegation that Heritage Action's donors earmarked their contributions for political purposes.

## I.   THE COURT LACKS SUBJECT MATTER JURISDICTION.

### A.   CLC Cannot Establish The Preconditions Necessary To File This Citizen Suit.

To establish this Court's jurisdiction to consider a citizen suit under § 30109(a)(8)(C), a plaintiff must satisfy two preconditions.  *See Perot v. FEC*, 97 F.3d 553, 557 (D.C. Cir. 1996) (explaining that the statute is jurisdictional).  *First*, a plaintiff must establish that the FEC's "dismissal of the complaint or the failure to act is contrary to law."  52 U.S.C. § 30109(a)(8)(C). *Second*, a plaintiff must establish that the FEC did not "conform … within 30 days" of a court's "declaration" that the FEC's "dismissal of the complaint or the failure to act is contrary to law." *Id.*  If the FEC "fail[s]" to "conform" to the court's order, "the complainant may bring, in the name of such complainant, a civil action to remedy the violation involved in the original complaint."  *Id.* CLC cannot satisfy these preconditions because the FEC dismissed the administrative complaint for reasons of prosecutorial discretion under *Chaney*.

### 1.   The FEC Did Not Fail To Act On CLC's Administrative Complaint.

CLC cannot establish a "failure to act" under § 30109(a)(8)(C) because the Commission took "action[]" on CLC's administrative complaint against Heritage Action on April 6, 2021.  FEC Vote Certification at 4.  On that date, the FEC voted on whether there was reason to believe that Heritage Action had violated FECA in a manner warranting enforcement.  *Id.*  That enforcement vote failed by a 3-3 breakdown.  *Id.*  The D.C. Circuit has described these 3-3 votes on whether to find reason to believe as "deadlock dismissals," *e.g.*, *Common Cause*, 842 F.2d at 448-49; meaning the FEC has acted on the administrative complaint despite the appearance of deadlock, *see Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165, 1170-71 (D.C. Cir. 2016) (explaining that FECA "compels

FEC to dismiss complaints in deadlock situations"). Because "there [were] fewer than four votes" to proceed with enforcement, the FEC "dismisse[d] the administrative complaint." *Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 315.[4]

## 2. The FEC's Supposed Failure To Act Was Not Contrary To Law.

Nor can CLC show that the FEC's "failure to act is contrary to law" under § 30109(a)(8)(C) —because there was no "failure to act." FECA requires a "failure to act" to establish jurisdiction, *id.*, not "agency action … unreasonably delayed," *compare* 5 U.S.C. § 706(1). Even assuming delay qualifies as a "failure to act," though, CLC cannot establish that the FEC acted "contrary to law" by taking action in April 2021.

While FECA "does not require that an [enforcement action] be completed within a specific time period," it does impose "an obligation to investigate complaints expeditiously." *DSCC v. FEC*, No. 1:95-cv-0349 (JHG), 1996 WL 34301203, at *1, *4 (D.D.C. Apr. 17, 1996). In determining whether the FEC has acted "expeditiously," the Court may look to the factors listed in *Common Cause* concerning "the credibility of the allegation, the nature of the threat posed, the resources available to the agency, and the information available to it, as well as the novelty of the issues involved." *Common Cause v. FEC*, 489 F. Supp. 738, 744 (D.D.C. 1980). In addition, the Court may consider the factors in *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (*TRAC*). Under those considerations, there is no basis to find that the FEC did not act expeditiously on CLC's administrative complaint.

---

[4] While CLC has taken the position in other litigation that the FEC does not "act" on an administrative complaint until the Commissioners take the ministerial step of voting to close the file, that theory is meritless. A matter is terminated where, as here, fewer than four Commissioners vote to find reason to believe that enforcement is warranted. *See* Ex. A at 2; *Common Cause*, 842 F.2d at 448-49 (recognizing reviewability of deadlock dismissals). But resolving that question is unnecessary in this case because the Commission closed the file in MUR 7516 on June 9, 2022. Ex. G (MUR closure notification letter). Thus, there is no dispute here that the FEC *acted* on CLC's administrative complaint—even if CLC may quibble with *when* that action took place.

*First*, the FEC did not unreasonably delay acting on CLC's administrative complaint.  CLC filed that administrative complaint in October 2018, Dkt. No. 1-2, and the FEC acted on it in April 2021, FEC Vote Certification at 4.  "The FEC lacked a quorum of commissioners on two separate occasions during this period—from September 1, 2019, to June 5, 2020, and again from July 3, 2020, to December 18, 2020.  And there is an open question on whether a court may find that an agency has unlawfully withheld action when the agency lacks quorum."  Dkt. No. 1-4 at 3 n.1 (citation omitted).  Indeed, CLC admitted that "[w]ithout a quorum of Commissioners, the FEC was unable to 'launch any new investigations, issue any advisory opinions, promulgate any rules, or render any decisions in pending enforcement actions.'"  *CLC v. FEC*, Dkt. No. 10 at 5.  Altogether, CLC's administrative complaint was pending before a full slate of Commissioners for only 16 months.  As the D.C. Circuit has recognized, even a two-year delay between the filing of an administrative complaint with the FEC and its conclusion is not necessarily contrary to law under § 30109.  *FEC v. Rose*, 806 F.2d 1081, 1091 & n.17 (D.C. Cir. 1986) (citing *Common Cause*, 489 F. Supp. at 743-44).  Nor is the Commission required to complete final action within a two-year election cycle.  *In re Nat'l Cong. Club*, Nos. 84-5701, 84-5719, 1984 WL 148396, at *1 (D.C. Cir. Oct. 24, 1984); *see also DSCC*, 1996 WL 34301203, at *7.  Accordingly, it is typically only three-year-plus delays that the D.C. Circuit finds unreasonable.  *See In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 n.12 (D.C. Cir. 2004) (collecting cases).

*Second*, the FEC faced a novel situation after Chief Judge Howell vacated its longstanding interpretation of § 30104(c) in August 2018.  "When the Court in [*Crossroads I*] vacated the Commission's long-standing disclosure regulation, mere months before a heated midterm election, the impact was seismic.  And like the aftermath of a volcano, it took time for the regulatory dust to settle after the eruption ceased."  Statement of Reasons at 6.  The court's decision left a number

23

of "questions" unanswered.  *Id.*  "For example, what does it mean to give 'for a political purpose,' a phrase central to the Court's interpretation of the statutory provision at issue in this matter?"  *Id.* And "[w]hat evidence is required to show that a donor gave for a political purpose – is it enough that a solicitation mentions the entity's political activity but does not specify what any particular funds will be used for, or must a donor affirmatively earmark that their funds may or must not be used for political purposes?"  *Id.*; *see* June 8 Policy Statement at 6 ("Precisely what information must be disclosed, by whom, and based on what conduct?  Failure to promulgate those instructions risks chilling constitutionally protected speech and political activity.").  CLC filed the complaint two months after Chief Judge Howell "announc[ed] a new rule for when such disclosure is statutorily required."  Statement of Reasons at 3.  It was not unreasonable for the FEC to take the time needed to assess the effect of these developments on its backlog of matters under review.

*Third*, the controlling Commissioners thought that an enforcement action here "would have been a poor use of agency resources."  *Id.* at 5 (capitalization altered).  "At the heart of this matter is First Amendment protected activity that took place at a time when the meaning of the provision of the law at issue was in flux, in a matter which came before the Commission as part of a tremendous enforcement backlog."  *Id.*  The controlling Commissioners observed that the Commission faced an enormous backlog involving more important matters.  "[W]hen this matter came before the Commission, the statute of limitations was fast approaching and the Commission faced an enforcement backlog (involving many cases of straightforward violations of the Act) arising from a prolonged period when the Commission lacked a quorum, and opening an investigation here would have only taken our attention, time, and resources away from resolving those matters."  *Id.* at 7.  As CLC observed, at the end of 2020, "the FEC had 466 unresolved pending matters before the agency."  *CLC v. FEC*, Dkt. No. 10 at 4.

### 3.   The FEC Did Not Fail To Conform To Judge Kelly's Order To Act.

CLC also fails to establish that the FEC did not "conform … within 30 days" of Judge Kelly's "declaration" that the FEC's "failure to act is contrary to law." 52 U.S.C. § 30109(a)(8)(C). Judge Kelly found that the FEC acted contrary to law on March 25, 2022, and ordered that "the FEC conform to this Court's Order within 30 days by acting on CLC's administrative complaint, MUR 7516." Dkt. No. 1-4 at 3. This order gave the FEC a deadline of April 25, 2022, to act. *Id.* Judge Kelly subsequently found that the "FEC has failed to conform to this Court's order entered on March 25, 2022." Dkt. No. 1-5 at 3. Unbeknownst to Judge Kelly, however, the FEC did not fail to "conform" to the Court's declaration before April 25, 2022, because the FEC had acted on CLC's administrative complaint all the way back in April 2021. By acting on CLC's administrative complaint in April 2021, the FEC did not fail to conform with a judicial order to act on the complaint before April 2022.

### 4.   The FEC's Dismissal Of The Administrative Complaint For Reasons Of Prosecutorial Discretion Was Not Contrary To Law.

CLC's Complaint must also be dismissed because the FEC dismissed CLC's administrative complaint for reasons of prosecutorial discretion that courts cannot review under FECA's "contrary to law" standard. 52 U.S.C. § 30109(a)(8)(C). It is blackletter law that agency decisions not to take enforcement action are presumptively unreviewable. *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C. Cir. 2007); *see Chaney*, 470 U.S. at 831-32. "[F]ederal administrative agencies in general and the Federal Election Commission in particular have unreviewable prosecutorial discretion to determine whether to bring an enforcement action." *Commission on Hope*, 892 F.3d at 438.

The D.C. Circuit has twice applied this principle to dismiss lawsuits attempting to trigger the citizen-suit provision in § 30109(a)(8)(C) where plaintiffs claimed that the FEC had acted

"contrary to law" when it dismissed administrative complaints for reasons of prosecutorial discretion. *Id.* at 440; *New Models*, 993 F.3d at 880. In *Commission on Hope*, the plaintiff claimed that the FEC had acted "contrary to law" by dismissing an administrative complaint in a 3-3 vote, with the controlling Commissioners explaining their vote on the basis of prosecutorial discretion. The D.C. Circuit held that "*Chaney* controls this case" because "[t]he three naysayers on the Commission placed their judgment squarely on the ground of prosecutorial discretion." 892 F.3d at 439. In doing so, the Circuit rejected the plaintiff's argument that the FEC's *Chaney* dismissal "triggers FECA's 'citizen-suit' provision," explaining that "a court may not authorize a citizen suit unless it first determines that the Commission acted 'contrary to law' under FECA." *Id*. at 439-440. "Yet to make this determination, a court necessarily must subject the Commission's exercise of discretion to judicial review, which it cannot do." *Id*. In *New Models*, the D.C. Circuit again refused to review a 3-3 dismissal in which the controlling Commissioners voted against taking enforcement action on the basis of prosecutorial discretion, explaining that "[w]hen a Commission decision rests even in part on prosecutorial discretion, … we cannot review it under the 'contrary to law' standard." 993 F.3d at 885. "FECA provides 'no "law" to apply' in reviewing the Commission's weighing of practical enforcement considerations, so a court has no basis on which to assess whether it is 'contrary to law.'" *Id.* And FECA itself "conditions the availability of a citizen suit on a series of triggering conditions, including a court determination that the Commission acted 'contrary to law.'" *Id.* at 891.

These two D.C. Circuit decisions are dispositive here. The controlling Commissioners' statement expressly invoked prosecutorial discretion as a basis for the dismissal. Statement of Reasons at 3, 5-7. Specifically, the three Commissioners, citing *Chaney*, explained that they "voted to dismiss this matter as an exercise of prosecutorial discretion" because "[a]t the heart of

this matter is First Amendment protected activity that took place at a time when the meaning of the provision of the law at issue was in flux, in a matter which came before the Commission as part of a tremendous enforcement backlog." *Id.*  Like other agency decisions not to enforce, their decision "'involve[d] a complicated balancing of a number of factors which are peculiarly within its expertise.'"   *Commission on Hope*, 892 F.3d at 439 n.7.   Namely, the controlling Commissioners' statement discusses the changing regulatory landscape, the changing case law about those regulations, fairness to subjects of the FEC's regulation, the statute of limitations for FEC enforcement, the FEC's enforcement backlog, and the allocation of Commission resources as some of the factors involved in their decision.  Statement of Reasons at 5-7.  In other words, as the Supreme Court noted in *Chaney*, the controlling Commissioners considered whether "proceeding with enforcement would have been a poor use of agency resources."   *Compare* Statement of Reasons at 5 (capitalization altered), *with Chaney*, 470 U.S. at 831 (identifying discretionary factors, including "whether agency resources are best spent on this violation or another").  This qualifies their decision as judicially unreviewable.

The Policy Statement of the same controlling Commissioners further confirms the applicability of *Chaney*'s bar to decisions not to pursue enforcement like the one at issue here. June 8 Policy Statement.  In particular, the Commissioners explained why "[p]rosecutorial discretion is appropriate in such situations, both to preserve agency resources and as a matter of due process and fair notice."  *Id.* at 7-8.  "It violates principles of fundamental fairness to hold respondents liable for violating legal rules that have not been previously announced, and any attempts by the Commission to enforce vague and confusing guidance risks waste, inefficiency, and significant litigation."  *Id.* at 8.

27

Judge Kelly, of course, did not know that the FEC had dismissed CLC's complaint for reasons of prosecutorial discretion when the court authorized this citizen suit because the Commission was concealing that information from the courts.  Had the court known these facts, the court would have dismissed CLC's complaint against the FEC under controlling D.C. Circuit precedent, and CLC never would have been able to file this citizen suit.  *See End Citizens United PAC v. FEC*, No. 21-1665 (TJK), 2022 WL 1136062, *3 (D.D.C. Apr. 18, 2022) (dismissing for lack of jurisdiction where FEC dismissed administrative complaint for reasons of prosecutorial discretion).

Judge Kelly's decision authorizing this citizen suit is not binding on this Court, which has "an independent obligation to determine whether subject-matter jurisdiction exists."  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 501 (2006); *see Lujan*, 504 U.S. at 561.  Judge Kelly's ruling is "not preclusive" because Heritage Action was not a party to the default judgment in that case.  Dkt. No. 17-4 at 6; *see CLC v. Iowa Values*, No. 1:21-cv-389 (RCL), 2021 WL 5416635, at *3 (D.D.C. Nov. 19, 2021); *Arizona v. California*, 530 U.S. 392, 414 (2000) (issue preclusion does not attach to default judgments); *cf. Crossroads Grassroots Pol'y Strategies*, 788 F.3d at 320 (describing district-court orders in the suit against the FEC as having only "persuasive weight" in the citizen suit that followed).  As Judge Kelly noted, "Heritage Action can advance the same jurisdictional arguments in the suit against it that it wants to make here," and this Court "will have to consider them, because whether the Commission's failure to act was contrary to law and whether it conformed with this Court's order to act implicate that court's subject-matter jurisdiction."  Dkt. No. 17-4 at 7.

Nor is Judge Kelly's ruling even persuasive, as it was based on the false premise that the FEC had never acted on CLC's administrative complaint.  In fact, the FEC disclosed its action on

the administrative complaint and Statement of Reasons only *after* Judge Kelly had entered a default judgment against the FEC.  In light of the "procedural mess" created by the FEC's concealment, Judge Kelly did not question "the validity of Heritage Action's arguments about whether the Commission acted on CLC's administrative complaint, whether any failure was contrary to law, or whether the Commission conformed with the Court's order to act." *Id*. at 3, 8. This Court must therefore independently determine whether CLC met the two preconditions, even though Judge Kelly previously concluded otherwise based on an incomplete record and the FEC's default.  *See, e.g.*, *CREW v. Am. Action Network*, No. 1:18-cv-945 (CRC), 2022 WL 612655 (D.D.C. Mar. 2, 2022) (*AAN*) (dismissing citizen suit based on subsequent legal development that rendered contrary-to-law holding in authorizing case erroneous).

*          *          *

In sum, the Court lacks subject matter jurisdiction over this citizen suit under § 30109(a)(8)(C) because the FEC acted on CLC's administrative complaint by dismissing it for reasons of prosecutorial discretion under *Chaney*.  Even if the preconditions in § 30109(a)(8)(C) were not jurisdictional, the complaint would still need to be dismissed for failure to state a claim under Rule 12(b)(6).  *See Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 31 (1989) (holding that courts "may not disregard" "mandatory conditions precedent to commencing suit," whether the conditions are framed as jurisdictional or procedural in nature).  Under either Rule 12(b)(1) or 12(b)(6), the Court cannot consider the merits of CLC's allegations against Heritage Action because the Court would be second-guessing the agency's absolute discretion not to take enforcement action against Heritage Action for reasons of prosecutorial discretion.

29

**B.  The Court Lacks Subject Matter Jurisdiction With Respect To Claims For Which Plaintiff Failed To Exhaust Its Administrative Remedies.**

At a minimum, the Court should dismiss the Complaint in part because CLC failed to exhaust its administrative remedies with respect to its allegation that Heritage Action violated § 30104(c) by failing to disclose contributors in connection with independent expenditures made in October 2018.  *See* Compl. ¶ 43.  Section § 30109(a)(8)(C) "permits [the Court] to consider only the claims that [CLC] alleged in its original administrative complaint."  *CREW v. Am. Action Network*, 410 F. Supp. 3d 1, 20 (D.D.C. 2019).  That provision "limits citizen suits to alleged 'violation[s] involved in the original complaint' to the FEC" for "good reason"—it ensures that the FEC can "take a first pass at the facts alleged and to make determinations using its relative expertise," and "promotes conciliatory efforts, which FECA emphasizes."  *Id.*; *see* 52 U.S.C. § 30109(a)(4)(A)(i).

CLC wisely concedes that § 30109(a)(8)(C) is jurisdictional.  *See* Compl. ¶ 8.  FECA limits judicial review, and subsequent direct suits brought by the "complainant," to alleged "violation[s] involved in the original complaint," 52 U.S.C. § 30109(a)(8)(C), "thereby mandating administrative exhaustion," *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006).  "Such 'jurisdictional exhaustion' … may not be excused."  *Id.*; *see Jordan v. FEC*, 68 F.3d 518, 518-19 (D.C. Cir. 1995) (holding that the timing provisions of § 30109(a)(8)(B) are jurisdictional). Indeed, CLC has taken that position elsewhere.  *See* Dkt. No. 19 at 43, *Iowa Values*, No. 1:21-cv-389 (RCL) (D.D.C. April 20, 2021) (noting that "this Court's jurisdiction to determine Defendant's liability may be limited to the claims CLC alleged in its original administrative complaint"), 2021 WL 5083350.

CLC's allegations about October 2018 expenditures were not part of CLC's October 2018 administrative complaint; indeed, they could not have been, as Heritage Action did not file the

30

relevant report until two months later, on January 24, 2019, and CLC never supplemented its administrative complaint.  Compl. ¶ 43; *see Iowa Values*, 2021 WL 5416635, at *10 ("[T]he Court cannot consider claims that occurred after plaintiff's original administrative complaint").  Because CLC did not include these allegations in its administrative complaint, this Court lacks jurisdiction to consider them.  And even if § 30109(a)(8)(C) were non-jurisdictional, its exhaustion requirements would remain "mandatory," and the Court must enforce them.  *Fleming v. USDA*, 987 F.3d 1093, 1099 (D.C. Cir. 2021).

## II.  CLC FAILS TO STATE A CLAIM.

Even if the Court had jurisdiction, it would have to dismiss the Complaint for a failure to state a claim based on two independent reasons.  *First*, enforcing § 30104(c) here would deny Heritage Action due process.  *Second*, the Complaint fails to allege that Heritage Action was required to disclose any donors under § 30104(c) when it reported independent expenditures it made in September 2018.

### A.  Enforcing § 30104(c) Against Heritage Action Would Violate Due Process.

Heritage Action never had fair notice in 2018 of its donor-disclosure obligations to the FEC.  Indeed, the controlling Commissioners recognized that due-process concerns warranted dismissal of CLC's administrative complaint in the exercise of the agency's prosecutorial discretion.  Statement of Reasons at 5.  *Chaney* requires the Court to respect the Commission's absolute discretion to dismiss CLC's administrative complaint to avoid a due-process violation.

#### 1.  Due Process Requires Fair Notice Of § 30104(c)'s Requirements.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see* U.S. Const. amend. V ("No person shall … be deprived of life, liberty, or property, without due process of law.").  "Traditional concepts of due process

31

incorporated into administrative law" thus forbid "penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Satellite Broad. Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987).   "Notice is fair if it allows regulated parties to 'identify, with ascertainable certainty, the standards with which the agency expects [them] to conform.'" *SNR Wireless LicenseCo, LLC v. FCC*, 868 F.3d 1021, 1043 (D.C. Cir. 2017).   These concerns "carry special weight" here, "since courts must be especially vigilant to prevent the chilling of First Amendment speech." *Democracy 21*, 312 F. Supp. 3d at 164-65.   Vague laws "inhibit protected expression by inducing 'citizens to "steer far wider of the unlawful zone" … than if the boundaries of the forbidden areas were clearly marked.'" *Buckley*, 424 U.S. at 41 n.48.

### 2.   Heritage Action Did Not Receive Fair Notice That § 30104(c) Required Donor Disclosure After *Crossroads I*.

The FEC did not provide Heritage Action with fair notice that § 30104(c) required disclosure of its donors at the time Heritage Action engaged in the activities at issue in the Complaint.   On August 3, 2018, Chief Judge Howell vacated the FEC's longstanding regulation requiring disclosure of only those donors who contributed for the purpose of funding "the reported independent expenditure."   *See supra* Background B.2.   Although the court reiterated *Buckley*'s holding that § 30104(c) requires disclosure of contributions "'earmarked for political purposes,'" the court did not offer any interpretation of that phrase.   *Crossroads I*, 316 F. Supp. 3d at 389. Instead, the court stayed its vacatur of the regulation for 45 days "to provide time for the FEC to issue interim regulations that comport with the statutory disclosure requirement of 52 U.S.C. § 30104(c)."   *Id.* at 415.   The vacatur finally took effect on September 18, 2018, directly in the middle of when Heritage Action making its independent expenditures on September 17 and 19, 2018, and less than a month before Heritage Action filed its October Quarterly Report related to those independent expenditures.

The FEC never issued interim regulations, only its October 4, 2018 interim reporting guidance that parroted the court's holding in *Crossroads I*. *See* Ex. B.  As the controlling Commissioners who voted to dismiss the administrative complaint observed: "[R]ather than offering meaningful insight to the regulated community about the precise scope of donor disclosure after [*Crossroads I*] or the meaning of 'earmarked for political purposes,' the Commission largely repeated the district court's vague and imprecise characterization of the Act's reporting mandates, without further exposition."  June 8 Policy Statement at 4.  Indeed, the FEC's guidance "was silent as to the meaning of those terms used by the Court in its decision but not specifically defined in the Act or Commission regulations," Statement of Reasons at 4, and thus it "provided no additional clarity about how the Commission would interpret and apply the law to require reporting of 'contributions used for other political purposes' going forward," June 8 Policy Statement at 5.  Consequently, "non-committee organizations were left to guess which of their donors might be subject to mandated disclosure in the future."  *Id.* at 5.

### 3.    The Commission Failed To Interpret § 30104(c) With The Force Of Law.

Not only did the FEC's interim guidance fail to provide substantive guidance about the law applicable to Heritage Action in 2018, but the Commission never acted with the force of law after *Crossroads I*, because it skirted the APA's procedural requirements for rescinding its longstanding regulation and providing a new binding interpretation of § 30104(c).  As the three Commissioners noted, the Commission issued guidance "not in the pages of the Federal Register, but in a brief press release."  Statement of Reasons at 6.  In fact, the FEC's longstanding regulation interpreting § 30104(c) remains on the books because the Commission took no action—until very recently— to rescind that regulation.   "The Commission has not initiated a rulemaking on independent expenditure reporting since the district court's decision," nor "has it clarified its interpretation

through any public enforcement action."  June 8 Policy Statement at 5.  "This continuing lack of direction about the extent of donor disclosure obligations under § 30104(c) has led to new dysfunctions in the Commission's enforcement docket in recent election cycles, and has stoked uncertainty and confusion."  *Id.* The Commission's inexcusable failure to act with the force of law after *Crossroads I*—as Chief Judge Howell instructed—contributed to the lack of fair notice that Heritage Action received about § 30104(c)'s donor-disclosure requirements in the fall of 2018.

The APA authorizes agencies to speak with the force of law if they issue a rule pursuant to a notice-and-comment process.  5 U.S.C. § 553.  Agencies must "use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance."  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015).  Here, the FEC's longstanding disclosure requirement applicable to non-committees that make independent expenditures, 11 C.F.R. § 109.10(e)(1)(vi), was issued through notice-and-comment rulemaking.  *See* FEC, *Amendments to Federal Election Campaign Act of 1971; Regulations Transmitted to Congress*, 45 Fed. Reg. 15,080 (Mar. 7, 1980).  Consequently, that rule could only have been repealed through APA notice-and-comment rulemaking.  *Perez*, 575 U.S. at 101.

The FEC's October 4, 2018 press release did not effect a valid repeal of § 109.10(e)(1)(vi), because the issuance of a press release was plainly not an exercise of notice-and-comment rulemaking under the APA.  Belatedly recognizing that it could only repeal the rule through the rulemaking process, the FEC only recently promulgated a rule, effective September 30, 2022, repealing § 109.10(e)(1)(vi) in response to *Crossroads I*.  *See* 87 Fed. Reg. 35,863.  Consequently, § 109.10(e)(1)(vi) was still on the books at all times relevant to the Complaint.  *See* Statement of Reasons at 4 ("However, the Commission did not commence a formal rulemaking to implement the [*Crossroads I*] decision (and the vacated regulation remains on the books).").  Thus, at the time

34

Heritage Action engaged in the activities at issue in the Complaint, it lacked fair notice that it would be subject to different disclosure requirements or what those requirements would be.

Chief Judge Howell's vacatur of § 109.10(e)(1)(vi) did not relieve the FEC of its APA obligation to repeal and replace that rule through the notice-and-comment rulemaking process.  As four Justices recently suggested, agencies are not excused from complying with the APA after a district court vacates a regulation.  *Arizona v. City & Cnty. of San Francisco*, 142 S. Ct. 1926, 1927-29 (2022) (Roberts, C.J., concurring in the dismissal of a petition as improvidently granted).  As the Chief Justice wrote, agency "'rulemaking-by-collective-acquiescence'" allows the government to "circumvent the usual and important requirement … that a regulation originally promulgated using notice and comment … may only be repealed through notice and comment." *Id.* at 1928; *see NRDC v. Wheeler*, 955 F.3d 68, 83-86 (D.C. Cir. 2020) (holding that EPA's rescission of a regulation in response to a court's vacatur failed to comply with the Clean Air Act's notice-and-comment requirement).  Here, the court's vacatur order in *Crossroads I* was not self-executing, and the FEC was required to repeal § 109.10(e)(1)(vi) through notice-and-comment rulemaking.  The FEC's failure to do so until well after Heritage Action engaged in the activities at issue in the Complaint deprived Heritage Action of fair notice of § 30104(c)'s donor-disclosure requirements.

### 4. The Commission Announced That It Would Not Enforce § 30104(c) With Respect To Heritage Action's October 15, 2018 Quarterly Report.

Recognizing the obvious unfairness of enforcing § 30104(c) immediately after *Crossroads I*, the full FEC announced that it would exercise its prosecutorial discretion not to enforce § 30104(c) for the next FEC quarterly filing deadline on October 15, 2018.  "In the interests of fairness, since no one was on notice until the district court's decision was handed down on Aug[ust] 3, the Commission will exercise its prosecutorial discretion for the quarterly reports due

Oct[ober] 15, 2018."  Ex. B.  Consistent with this announcement of prosecutorial discretion, the FEC's Office of General Counsel recommended that the Commission dismiss CLC's allegation that Heritage Action violated § 30104(c) in its October 15, 2018 Quarterly Report by failing to comply with § 30104(c) as interpreted by *Crossroads I*.  Statement of Reasons 5 n.8.  Enforcing § 30104(c) against Heritage Action in this case—despite the FEC's reporting announcement that it would not enforce § 30104(c) for the quarterly reports due on October 15, 2018—would deprive Heritage Action of due process.

### 5.   The Commission Dismissed The Complaint To Avoid A Due-Process Violation.

Confirming the point, the three controlling Commissioners have twice recognized that enforcing § 30104(c) on this record would raise serious due-process concerns.  In their Statement of Reasons, they emphasized that the matter involved "First Amendment protected activity that took place at a time when the meaning of the provision of the law at issue was in flux."  Statement of Reasons 5.  The Commissioners remarked that the interim guidance "was far from the picture of clarity, and was not issued until months after the decision and weeks after the activity at issue in this matter." *Id.* at 6.  "Yet, by merely repeating select quotations from the opinion, the guidance could not answer the thorny questions posed by the court's holding.  Nor could it substitute for proper rulemaking that might address the underlying legal complexities raised by the underlying judicial opinions." *Id*.  As "a matter of procedural due process," the Commissioners declined to "engage in after-the-fact rulemaking via the enforcement process." *Id.* at 6-7.

Likewise, in their June 8 Policy Statement, these Commissioners expressed concerns that the FEC "has not proffered clear guidance on how [non-committee] organizations should report contributions 'earmarked for political purposes,' in accordance with [*Crossroads I*'s] holding."  June 8 Policy Statement at 2.  As they observed, the FEC's 2018 interim guidance, "rather than

  
offering meaningful insight to the regulated community about the precise scope of donor disclosure after [*Crossroads I*] or the meaning of 'earmarked for political purposes,' … largely repeated the district court's vague and imprecise characterization of the Act's reporting mandates, without further exposition." *Id.* at 4. They cautioned that "[t]he resulting uncertainty has created a chilling effect on individuals' and organizations' First Amendment rights to engage in free speech and free association," and that "[t]he absence of regulatory guidance also raises significant due process issues." *Id.* at 2.  "It violates principles of fundamental fairness to hold respondents liable for violating legal rules that have not been previously announced, and any attempts by the Commission to enforce vague and confusing guidance risks waste, inefficiency, and significant litigation." *Id.* at 8.

Accordingly, the Commissioners decided that, "for complaints based on conduct preceding or contemporaneous with this statement, we generally intend to exercise the Commission's prosecutorial discretion to dismiss complaints alleging failure to disclose contributions under § 30104(c)(1) and seeking general donor disclosure from non-committee organizations that engage in express advocacy activities." *Id.* at 7.  They determined that "[p]rosecutorial discretion is appropriate in such situations, both to preserve agency resources and as a matter of due process and fair notice." *Id.* at 7-8.  The Commission's "constitutionally sensitive mission" requires it to be "especially respectful of the fundamental pillars of due process: 'first, that regulated parties should know what is required of them so they may act accordingly; second, [that] precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Id.* at 8.

Indeed, as the June 8 Policy Statement makes clear, Heritage Action did not receive fair notice of § 30104(c)'s donor-disclosure requirements until June 2022.  It was not until then that

the controlling Commissioners explained their interpretation of when a contribution would be considered "earmarked for political purposes," which was the first time regulated parties received some direction as to when the Commission would require donor disclosure for independent expenditures.  *Id.* at 6-7.  Plainly, Heritage Action could not have had fair notice of this interpretation, and thus the application of donor-disclosure requirements for independent expenditures, in September 2018.  The Court should dismiss the Complaint to avoid the same due-process violation that the controlling Commissioners sought to avoid by dismissing the administrative complaint.

**B.   The Complaint Fails To State A Claim That Heritage Action Violated § 30104(c).**

Even assuming Heritage Action had fair notice of the law in 2018, the Complaint fails to state a claim that Heritage Action violated § 30104(c).  To state a claim that Heritage Action violated § 30104(c) after *Crossroads I*, CLC must allege that Heritage Action failed to disclose donors whose contributions were "'earmarked for political purposes.'"  316 F. Supp. 3d at 389. Because the Complaint does not contain any factual allegations that plausibly suggest that any donors earmarked their donations to Heritage Action for political purposes, CLC fails to state a claim that Heritage Action violated § 30104(c).

**1.   FECA Requires CLC To Allege That Heritage Action Failed To Disclose Donors Who Earmarked Their Contributions For Political Purposes.**

The essential element of a violation of a non-committee's donor-disclosure obligation under § 30104(c)(1) after *Crossroads I* is that the non-committee failed to disclose to the FEC its donors who gave it political "contributions." 52 U.S.C. § 30104(c).  Under *Buckley*'s limiting construction, this means donors must be shown to have intentionally given the non-committee "dollars ... *earmarked* for political purposes."  424 U.S. at 23 n.24, 78 (emphasis added); *see FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 262 (1986) (discussing the requirement to disclose

38

"funds *intended* to influence elections" (emphasis added)).   Chief Judge Howell reiterated this donor-earmarking requirement in *Crossroads I*, *see* 316 F. Supp. 3d at 376, 378, which the D.C. Circuit acknowledged reaches "only those [donors] who donate money for the intended purpose of influencing an election," *Crossroads II*, 904 F.3d at 1019.   The FEC, moreover, incorporated *Buckley*'s earmarking requirement into its interim reporting guidance of October 4, 2018, Ex. B, and has represented in court that such earmarking is a necessary element to the compelled disclosure of donors under § 30104(c):  "As explained by [the FEC's] attorney at the hearing … a non-political organization … that makes independent expenditures exceeding $250 must disclose only those donors whose contributions are earmarked for political purposes and are tied to a federal election.  *Absent such an earmark and tie, the donor need not be disclosed.*"  *Wis. Fam. Action v. FEC,* No. 21-C-1373, 2022 WL 844436, at *10 (E.D. Wis. Mar. 22, 2022) (emphasis added) (citation omitted).

The concept of donor "earmarking" is not a novel one.   In the context of campaign contributions made through intermediary conduits, the FEC has adopted a regulation that expressly defines the term "earmarked."   It means a specific "designation, instruction, or encumbrance" made by a contributor that results in those funds being used as specified.   11 C.F.R. § 110.6(b)(1). This is also consistent with the ordinary meaning of the term.   *See*, *e.g.*, *Bd. of Trade of City of Chi. & Subsidiaries v. Comm'r*, 106 T.C. 369, 386 (1996) (quoting dictionary definition of "earmarking" as "'to designate or set aside (funds) for a specific use or owner'").

In that context, the Commission has stated that "a contribution subject to [FEC] earmarking rules must *in fact* be earmarked by the person making the contribution."  MUR 4831/5274 (Nixon Campaign Fund), Statement of Reasons of Vice Chairman Smith and Comm'r Toner at 3.   The FEC thus "has determined that funds are considered 'earmarked' only when there is clear

documented evidence of acts by donors that resulted in their funds being used by the recipient committee" as specifically designated, and the FEC "has routinely rejected allegations of earmarking where ... there is no clear designation or instruction given by the donor."  MUR 5732 (Matt Brown for U.S. Senate), Factual & Legal Analysis at 6 & n.4; *see* MUR 6221 (Transfund PAC), First General Counsel's Report at 11 ("The Commission has rejected earmarking claims even where … the contributions lacked a clear designation or instruction").

Consistent with this understanding of earmarking, the three controlling Commissioners stated that they will deem a donation "earmarked for political purposes" under *Crossroads I* only when it has been specifically "designated or solicited for, or restricted to, activities or communications that expressly advocate the election or defeat of a clearly identified candidate for federal office."  June 8 Policy Statement at 7; *see id.* at 7 n.29 (noting that "existing definitions in the Commission's rules are possible models for further defining 'earmarked'" (citing 11 C.F.R. § 110.6(b)(1)).  Those Commissioners interpret "a donation made to a non-committee organization [to be] 'earmarked for political purposes' within the meaning of § 30104(c)(1) *only if it is designated or solicited for, or restricted to, activities or communications that expressly advocate the election or defeat of a clearly identified candidate for federal office.*"  *Id.* at 7 (emphasis added). Thus, earmarking requires a showing that a donor actually gave money "to a non-committee organization with a specific instruction that the organization use the funds for independent expenditures or other activities to expressly advocate for or against a candidate" or in "direct response to a solicitation for funding such expenditures or activities."  *Id.*

### 2.   The Complaint Does Not Plausibly Allege That Any Donations To Heritage Action Were "Earmarked For Political Purposes."

Informed by the FEC's understanding of the meaning of earmarking, the Complaint does not contain any factual allegations that plausibly suggest that any donor to Heritage Action

earmarked funds for political purposes.  Indeed, the controlling Commissioners concluded that "[n]o evidence contradicting Heritage's statements was presented to the Commission" by CLC through its administrative complaint.  Statement of Reasons at 5.  Like the administrative complaint, the Complaint here consists only of sweeping, conclusory assertions that Heritage Action had a donor-disclosure obligation on the quarterly reports filed with the FEC because it "spent hundreds of thousands of dollars on election advertising supporting specific congressional candidates in the weeks leading up to the 2018 midterm federal elections but failed to disclose the contributors who paid for its spending in violation of the Federal Election Campaign Act."  Compl. ¶ 1; *see id.* ¶ 28. The Complaint also acknowledges that Heritage Action's disclosure reports expressly stated that the independent expenditures were paid using "general treasury funds," not earmarked funds.  *Id.* ¶¶ 37, 40.

The August 8, 2018 Press Release and *McClatchy* article on which the Complaint relies add nothing.  Those sources merely described Heritage Action's general plans to spend $2.5 million on independent expenditures in support of 2018 midterm candidates.  *Id.* ¶¶ 30-34.  They do not allow for a "reasonable inference" that any donor earmarked funds in support of Heritage Action's independent expenditures.  *Iqbal*, 556 U.S. at 678.

With respect to the August 8 press release, the Complaint alleges that the release "declar[ed] [Heritage Action's] intention to solicit and 'spend $2.5 million and back 12 candidates this November."  Compl. ¶ 30.  This allegation materially misstates the press release, which never described an "intention to solicit" funds for its $2.5 million independent expenditure commitment. It simply announced Heritage Action's intended political activities in the upcoming elections without any reference to the financing.  *See* 2018 Press Release (cited at Compl. ¶ 30 n.10).  In any event, nothing in the press release plausibly suggests that Heritage Action's independent

expenditures were paid for using earmarked funds rather than with general treasury funds, as stated in Heritage Action's FEC reports.  *See* Compl. ¶¶ 37, 40.

The same is true for the *McClatchy* article, which largely repeated the information from the press release and did not describe donor earmarking.  In fact, the only reference to any donors or fundraising is a quote attributed to Heritage Action's former Executive Director, who purportedly stated, "What we're telling donors is, every dollar we raise over our budget we can *effectively* pour more into these races."  *Id.* ¶ 34 (emphasis added).  This mere truism—obviously, the more money a nonprofit raises to its general treasury, the more it can spend on activities beyond its exempt purposes, including political advocacy—does not plausibly suggest that donors were earmarking funds for political uses.

Boiled down, the Complaint alleges that non-committee organizations like Heritage Action must disclose their donors under § 30104(c) when they merely announce in advance their intentions to engage in independent expenditures.  That is not—and cannot be—the disclosure obligation following *Crossroads I*.  *See Wis. Fam. Action*, 2022 WL 844436, at *10 ("Under the FEC's interpretation of [§ 30104(c)], [a non-committee] will not be required to disclose all donors simply because it makes independent expenditures aggregating more than $250 with respect to a given election in a calendar year.").  The FEC has made clear that donor funds are not "earmarked" for a specified use merely because they are provided in response to broad pronouncements of intention to support federal candidates.  For example, the Commission has explained that no earmarking occurred "where the contributions only resulted from party solicitations suggesting support for [a candidate] or merely coinciding with support provided to the [candidate's] campaign.  MUR 5732 (Matt Brown for Senate), Factual & Legal Analysis at 6 (citing MUR 4831/5274 (Nixon Campaign Fund)); *see* MUR 5520 (Billy Tauzin Congressional Committee),

First General Counsel's Report at 7-8 (concluding that a newspaper article asserting that a state party committee acknowledged having a "wink[] and [a] nod[]" arrangement with donors, with no actual designation or instruction by any donor, was insufficient to find reason to believe earmarking had occurred).   The June 8 Policy Statement similarly rejects such a loose understanding of earmarking: it requires there be "specific instruction[s]" from a donor, which may include giving in "direct response to a solicitation" that makes clear the money will be used to advocate for federal candidates, and not some other general purpose of the non-committee.  June 8 Policy Statement at 7.  The D.C. Circuit, too, has rejected such an interpretation, vacating a regulation that treated donations made in response to solicitations that indicated that "'*any* portion'" of the funds received would be used to support or oppose federal candidates as contributions earmarked for political purposes.  *Emily's List v. FEC*, 581 F.3d 1, 18, 21 (D.C. Cir. 2009) (Kavanaugh, J.).

In short, the Complaint presents no allegations plausibly suggesting that Heritage Action's independent expenditures were funded with donations "earmarked for political purposes" rather than from unencumbered funds within the nonprofit's general treasury account.  CLC does not identify any donors claiming to have earmarked donations for Heritage Action's 2018 independent expenditures, nor does it present any other specific allegations concerning Heritage Action's fundraising in connection with those expenditures.  CLC thus has "not nudged [its] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)

### 3.   The Allegations In The Complaint Undermine Any Inference That Donors Earmarked Their Contributions To Heritage Action For Political Purposes.

In its reporting guidance issued after *Crossroads I*, the FEC stated that non-committees reporting independent expenditures needed only to disclose donors who donated funds "earmarked for political purposes" on or after August 4, 2018, the day following *Crossroads I*.  Ex. B.  The

Complaint's own attachment suggests that the money used by Heritage Action to fund its 2018 independent expenditure activities was raised well before then.  Thus, if any donor "earmarking for political purposes" might have occurred with respect to the funds that furthered Heritage Action's political spending in 2018, it would have been while 11 C.F.R. § 109.10(e)(1)(vi) remained in force and before the broader donor-disclosure obligations post-*Crossroads* attached. The Complaint alleges no violation of the reporting obligation under 11 C.F.R. § 109.10(e)(1)(vi), and thus fails to state a plausible claim.

The Complaint makes much of the timing of August 8, 2018 Press Release and related *McClatchy* article discussing Heritage Action's plan to dedicate $2.5 million toward independent expenditures in support of House candidates.  But as the *McClatchy* article states, Heritage Action had disclosed this plan much earlier—at least as early as July 17, 2018—a fact the Complaint conveniently omits.  It was then that the *Wall Street Journal* first reported on Heritage Action's "plan[] to spend $2.5 million, starting in early September."  Peterson, *supra*.

The only reasonable inference is that Heritage Action would not have disclosed its commitment to spend such a specific dollar amount on political activities beyond its tax-exempt purpose without the necessary funds already in hand.  To the contrary, common sense dictates that Heritage Action raised and budgeted the $2.5 million it allocated toward 2018 independent expenditure activities well in advance of August 4, 2018.

### 4.   Allowing CLC's Claims to Proceed Would Raise First Amendment Concerns.

Allowing CLC's claims to proceed without any factual allegation of donors having earmarked their donations for political purposes would raise serious First Amendment concerns for Heritage Action, its donors, and all other politically active non-committee groups.  *Buckley* admonished that "compelled disclosure has the potential for substantially infringing the exercise

of First Amendment rights." 424 U.S. at 66. It therefore imposed the "earmarked for political purposes" construction on FECA's definition of "contribution" to ensure that money given to "other organizations" that are not political committees will only be regulated by FECA when the donors intend their money be used "for the purpose of … influencing" a federal election. *Id.* at 78. Only in such cases will funds donated to a non-committee bear "a sufficiently close relationship to the [disclosure] goals of the Act" to be reached by FECA. *Id.*

Thus, to allow a claim under § 30104(c) to proceed absent a strict showing of donors earmarking for political purposes could sweep up general donors who support a non-committee's general mission but who do not necessarily donate for the purpose of furthering the organization's electoral advocacy. This would risk chilling the political speech of countless nonprofit groups looking to engage politically. As the Supreme Court recently warned, "'compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action.'" *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (brackets omitted). And Heritage Action is indeed a cautionary tale: due to the uncertainty caused by CLC's administrative complaint, it has not made an independent expenditure in the almost four years since CLC filed that complaint.

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

Dated: July 8, 2022                         Respectfully submitted,


*s/ Brett A. Shumate*
_____

Brett A. Shumate
   (D.C. Bar No. 974673)
E. Stewart Crosland
   (D.C. Bar No. 1005353)
Brinton Lucas
   (D.C. Bar No. 1015185)
Stephen J. Kenny
   (D.C. Bar No. 1027711)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

*Counsel for Defendant*


46